UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CR-57-TS |
| | ) | |
| JAMES LESHORE | ) | |

**OPINION**

This matter is before the Court on Defendant James Leshore's Motion to Suppress. The Defendant was indicted on September 28, 2005, for violating 18 U.S.C. §§ 2, 924(c), and 2113(a) and (d) in connection with a bank robbery that occurred on September 13, 2005. The Defendant seeks to suppress statements made during police questioning on the day of the robbery as involuntary due to his incapacity caused by his ingestion of drugs and alcohol. The Defendant filed his motion on November 3, 2005. The government responded on November 18, 2005. The Court held a hearing on the matter on December 21, 2005. The Defendant filed a brief supporting his motion on January 26, 2006, and the Government responded on February 13, 2006.

**A.    Findings of Fact**

After assessing the credibility of the Defendant and the police officers and watching the video of the interrogation, the Court makes the following findings of fact: The Defendant is a twenty seven year old male previously diagnosed with anxiety and depression. He can read and write. He was convicted of false informing in 1998 and again in 2003. In his previous dealings with police, he has been interviewed and has had his rights read to him. The Defendant says he was not impaired during these previous encounters.

At the hearing, the Defendant described what he did on the morning of September 13, 2005,

the day the bank robbery occurred. He woke up around 7:15 a.m. and sometime before 8:00 a.m. left his fiance's residence at 7942 Serenity Drive in Fort Wayne for a drug house on Cass street. He said he began walking, but stole a bicycle on the way. It took him about an hour and a half to two hours to get there. When he got there, he said he bought and smoked two and a half grams of crack cocaine and drank four or five beers. He left there to go to a house six blocks away that was owned by a woman he knew as Lindsey. With him he took seven cans of beer, some wine, and a gram and a half of crack cocaine. While there, he opened a can of beer, drank several shots of vodka provided by Lindsey, and smoked the gram and a half of cocaine that remained. While Lindsey was in the bathroom, the Defendant said he found a pile of money on the table under a newspaper. Lindsey caught him trying to steal the money and kicked him out of the house. He began walking back toward the drug house on Cass street when he saw a police car. He said he hid the money on the back porch of a house and sat on the hill in front of the house, where he was arrested and brought to the police station.

The Defendant said that during his interrogation, his mind was numb and he was shocked, delirious, sort of emotional, and gone. (Tr. 20.) He answered the questions hoping to be able to leave so he could go do more drugs, his only concern at the time.

The police officers who testified offered a different assessment of the Defendant's mental state. Around noon on September 13, 2005, a Fort Wayne police officer encountered the Defendant in front of a house and arrested him. When Officer Fritz Rommel arrived at the scene, the Defendant was in a squad car for holding. With the Defendant wearing handcuffs, Officer Rommel escorted the Defendant to Rommel's car, which was located a half a block away. He transported the Defendant to the police station and brought the Defendant up an elevator and into the interview

room. Officer Rommel said during this time, the Defendant did not stumble, slur his speech, or exhibit any strange behavior. He was attentive and followed commands. Officer Rommel did not smell any alcohol on the Defendant when standing next to him. Officer Rommel is not drug recognition certified, but he has received some training in the recognition of intoxicated persons.

The government's Exhibit 2 is a four hour video of the time the Defendant spent in the interview room. After being brought into the room, the Defendant waited for forty minutes for the officers to arrive. During this time, he examined his shirt and pants for a few minutes, and for the rest of the time, sat quietly and waited. When officers later questioned the Defendant, they asked him about red stains on his pants, shirt, and pockets and whether they were caused by a dye pack.

Special Agent Loran arrived to talk to the Defendant. Agent Loran worked eleven years as a park ranger, sometimes dealing with intoxicated park visitors. For two years, he worked with the DEA in Miami in undercover drug operations. He has received training regarding the illegal drug industry and the effects of drugs on users. For the past 15 years, Agent Loran has worked in the FBI and received training there in being alert to individuals who may be intoxicated. In the past, he has stopped interviews of suspects because the suspect was intoxicated. Agent Loran said that he noticed nothing to indicate the Defendant may have been under the influence of drugs or alcohol. The Defendant's pupils were not constricted. Agent Loran did not smell alcohol, but he did smell pepper spray, which can be caused by an exploding dye pack. The smell of pepper spray was faint, and would not have overpowered the smell of alcohol had it been present.

Agent Loran gave the Defendant a form listing a suspect's *Miranda* rights. (Gov. Ex. 1.) The Defendant read his rights out loud and signed the form. Agent Loran questioned the Defendant for about forty minutes, and the Defendant's responses did not suggest he had a diminished mental

3

capacity or was under the influence of an intoxicating drug. The Defendant told his version of the events of that morning, though his account on September 13, 2005, differed from what he testified to at the December 21 hearing. In September, he told Agent Loran that he left his place around 10:00 a.m., and in court, he said he left before 8:00 a.m. Also, after his arrest he said he found the money on the back porch of the house where he was arrested and that is where he stole it. He did not say he found it on Lindsey's table and stole it from her as he stated in the December hearing. Also, after his arrest, he never said he smoked crack cocaine that day or made any mention of being intoxicated or impaired.

     The video shows several other officers question the Defendant after Agent Loran. They confronted him with evidence that he robbed the bank, including Lindsey's statements, surveillance photographs, evidence regarding his fiance's car, and red dye from the dye pack. They pointed out inconsistencies or problems with his story and said he would probably serve less time in prison if he cooperated. After about 80 minutes of further questioning, the Defendant was left alone for another hour before being taken to jail.

     The Court does not find the Defendant's statements at the evidentiary hearing to be credible. The Defendant's statements in court are inconsistent with what he told the officers in September and he has no good explanation for the inconsistencies. Other than the Defendant's statements, nothing suggests he was impaired or under the influence of any drug. The video of the Defendant sitting in the conference room for four hours shows no behavior suggesting impairment and the Defendant has not pointed to any particular part of the video that would suggest impairment. Officer Rommel and Agent Loran were near the Defendant and did not notice anything unusual. Their testimony is consistent with what is shown in the video and the Defendant's testimony is not. The Defendant has

4

been convicted twice for crimes of dishonesty, and, in light of the problems surrounding his statements, there was nothing about his in-court testimony that made it particularly believable. For these reasons, the Court finds the Defendant was not under the influence of any drug so that he had a diminished capacity to interact with the officers or understand what was going on.

**B.      Whether the Defendant's Miranda Waiver Was Voluntary**

The first step in considering whether the Defendant's statements must be suppressed is to determine whether he knowingly waived his *Miranda* rights. Waiver of *Miranda* rights and voluntariness of confessions require separate inquiries. *Baskin v. Clark*, 956 F.2d 142, 145 (7th Cir. 1992). A waiver of a suspect's *Miranda* rights is valid only if it is made voluntarily, knowingly, and intelligently. *Colorado v. Spring*, 479 U.S. 564, 566 (1987). This inquiry has two dimensions. "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* at 573. "Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Both inquiries are judged by the totality of the circumstances. *Id.* The government has the burden of showing waiver was valid by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The video tape shows the Defendant reading his rights out loud from a form and then signing the form. Agent Loren was sitting across the table facing him. Agent Loren clarified for the Defendant what the waiver meant where it stated: "no pressure or coercion of any kind has been used." (Gov. Ex. 1.) There was no intimidation, coercion, or deception here; the Defendant chose to waive his rights. The Defendant was not under the influence of any drugs affecting his capacity

5

to understand what was going on or to intelligently assess his situation. His recitation of his rights made the Defendant fully aware of his rights and the consequences of waiving them. He has had his rights read to him before and has been questioned by the police on previous occasions. The totality of the circumstances shows the waiver to be completely voluntary, knowing, and intelligent. Thus, the government has carried its burden in showing the waiver to be valid.

**C.    Whether the Defendant's Statements Were Voluntary**

"A district court may admit a confession into evidence only if the accused made it voluntarily." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). The "test for a voluntary confession is 'whether the defendant's will was overborne at the time he confessed.'" *United States v. Haddon*, 927 F.2d 942, 945–946 (7th Cir. 1991) (quoting *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir.1988)). Coercive police activity must be causally related to a confession for it to be involuntary within the meaning of the Fourteenth Amendment. *Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

Coercion is examined from the perspective of a reasonable person in the position of the suspect. *Huerta*, 239 F.3d at 871. "A confession is voluntary if, in the totality of the circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Huerta*, 239 F.3d at 871 (quoting *Dillon*, 150 F.3d at 757). In looking at the totality of the circumstances, courts have found relevant a defendant's age, education, intelligence, experience with

6

police, and mental state. The length of detention, nature of interrogations, notification of constitutional rights, and use of physical punishment are also relevant. *Id.*; *United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir. 1994). Where a defendant claims to have been under the influence of drugs so that voluntary confession was impossible, "[i]t is a balancing test that must be employed: when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *Haddon*, 927 F.2d at 946. Finally, "merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct," and "the police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *Sablotny*, 21 F.3d at 752–753.

Because the Defendant was not impaired and the officers had no reason to believe he was impaired, their questioning of the Defendant cannot be characterized as coercive. They informed the Defendant of the evidence they had gathered that implicated him and rigorously questioned the Defendant as to the inconsistencies in his story. This is not coercion. Also, the Defendant's statements were voluntary. The video shows him arguing with the officers when they disputed his story and he appears to be rationally engaged in discussions with the officers. The Court does not believe the Defendant's statements that he smoked two and a half grams of cocaine or that he drank as much alcohol as he claimed. Nothing other than these unconvincing statements suggests that he was impaired. No other circumstance points to his statements being involuntary. He was not physically abused. He was interrogated for about two hours, was of sound mental state, and had previous dealings with the police. The totality of the circumstances show the Defendant's statements

were voluntary.

## ORDER

For the reasons stated, the Defendant's motion to suppress [DE 25] is DENIED. A telephone conference is SET for Wednesday, March 1, 2006, at 9:30 a.m. to schedule a final pretrial conference and a date for trial to begin.

SO ORDERED on February 27, 2006.

/s/ Theresa Springmann  
THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT